# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. SAG-22-105 |
| v. | |
| MARK ROBERT UNKENHOLZ | |

## MARK ROBERT UNKENHOLZ'S MEMORANDUM IN AID OF SENTENCING

Mark Unkenholz is scheduled for sentencing on November 20, 2025, for the Unlawful Removal and Retention of Classified Documents or Materials in violation of 18 U.S.C. § 1924(e). The parties jointly recommend a no jail sentence for Mr. Unkenholz. The defense requests a sentence of one-year probation. This is the appropriate sentence for Mr. Unkenholz because of (1) his exceptional character and lifetime of service to the United States, (2) the unusual nature of the offense, i.e. that Mr. Unkenholz lacked any intention to do harm and no harm was done, and (3) the extraordinary consequences that Mr. Unkenholz has already suffered and will continue to suffer from this prosecution and conviction.

Mark Unkenholz's remarkable history and characteristics compel a sentence with no jail time. Mr. Unkenholz is a man of impeccable character, a patriot, who has devoted his entire career to public service and protecting his country. Letters from many colleagues who are most familiar with Mr. Unkenholz's work testify to his character and devotion to mission. This evidence demonstrates that the good of Mr. Unkenholz's life far outweighs the conduct for which he is being sentenced.

Mr. Unkenholz faces sentencing for a felony conviction of an unusual nature. There is no evidence that Mr. Unkenholz intended any harm and no harm was done. 18 U.S.C. § 1924(e) was

1

until 2018 a misdemeanor and is rarely prosecuted.[1]  The United States Sentencing Guidelines do not provide an applicable guideline. Both parties stipulate in the plea agreement that the Guidelines provide no applicable or analogous guideline.

Finally, this prosecution has inflicted severe consequences for Mr. Unkenholz already. Mr. Unkenholz has lost a career that was his identity. He will lose employment opportunities and important civil rights. He has suffered the "civil death" that comes with a felony conviction.

Not a day of jail is necessary to meet the purposes of sentencing under 18 U.S.C. § 3553. Mr. Unkenholz has already been profoundly punished. The prosecution itself has sent a strong deterrence message to others. Indeed, some former leaders at NSA have expressed concern that the message has been excessive and that the prosecution may deter necessary mission-centric work. As the parties have both recognized, jail is not justice for Mr. Unkenholz. And may well diminish respect for the law.

## ARGUMENT

As the court is aware, 18 U.S.C. § 3553(a) mandated that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. The statute requires the Court to consider a number of factors "in determining the sentence to be imposed." 18 U.S.C. § 3553(a). The argument below addresses each of these factors to explain why a non-incarceration sentence is appropriate. Letters written to the Court on behalf of Mr. Unkenholz, and a report from one expert, will be referred to in the argument, but are attached as exhibits.

---

[1]    Based on a review of available data from Fiscal Years 2019-2023, undersigned counsel dentified only one sentencing under 18 U.S. Code § 1924. That case was from 2021 in the Southern District of Ohio and resulted in a sentence of a year and a day. The data used for this analysis was extracted from the U.S. Sentencing Commission's "Individual Datafiles," which are publicly available for download on its website. U.S. Sent'g Comm'n, *Commission Datafiles*, https://www.ussc.gov/research/datafiles/commission-datafiles

## I. The Kinds of Sentences Available, the United States Sentencing Guidelines, and Pertinent Policy Statement (18 U.S.C. § 3553(a)(3), (a) 4, and (a)(5)

The parties and probation disagree about the availability of an "analogous" guideline in this case. Under the plea agreement, the parties agree that there is no analogous guideline that applies to a conviction under 18 U.S.C. § 1924(a). The Presentence Report (PSR) disagrees and claims that USSG 2M3.3 is sufficiently analogous to apply to Mr. Unkenholz's crime of conviction. The PSR is wrong. The elements of the crime of conviction here - 18 U.S.C. § 1924(a) - are too far removed from the elements of the offenses covered under 2M3.3 to be sufficiently analogous under USSG 2X5.1(a).

As all circuits to decide the issue have uniformly held, the sufficiently-analogous inquiry under USSG 2X5.1(a) requires an elements-based approach. Specifically, this means the court must determine whether the elements of the offense of conviction - not the underlying facts - are sufficiently analogous to the guideline. Although a perfect match is not required, the proffered guideline must be in the same proverbial ballpark as the offense of conviction.

To comply with § 2X5.1, a district court must first determine whether any guideline is sufficiently analogous to the defendant's crime of conviction. See *United States v. Clark*, 981 F.3d 1154, 1162 (10th Cir. 2020). To determine whether there is a sufficiently analogous guideline provision, courts have typically considered three approaches. See *United States v. Jackson*, 862 F.3d 365, 372 (3d Cir. 2017) (identifying the three approaches). The first approach is the elements-based approach. See id. Under an elements-based approach, *1057 a court compares the elements of the defendant's crime of conviction to the elements of federal offenses already covered by a specific guideline. *Clark*, 981 F.3d at 1162. The second approach is the indictment-facts approach, where the district court compares the guidelines to the facts alleged in the indictment. See *United States v. McEnry*, 659 F.3d 893, 900 (9th Cir. 2011) (district court erred when it based its choice "not on the

elements of the offense or the facts alleged in the indictment, but on the defendant's particular relevant conduct and the risk it created"); but see *Jackson*, 862 F.3d at 372–73 (indictment-facts usually applies when more than one guideline is assigned to a statute or when no guideline is assigned, but the court determines more than one guideline is sufficiently analogous, and selects the most analogous). And the third approach is known as the broad-circumstances approach, where the district court considers all of the circumstances and makes factual findings to support its ultimate selection. See *Jackson*, 862 F.3d at 372.

"*Betts* and the government agree that the elements-based approach is the most appropriate for his case. The majority of circuits that have decided the issue have also adopted this approach. See *Clark*, 981 F.3d at 1162; *Jackson*, 862 F.3d at 374-5; *United States v. Calbat*, 266 F.3d 358, 363 (5th Cir. 2001); *United States v. Osborne*, 164 F.3d 434, 437–38 (8th Cir. 1999). We now join those circuits in holding that courts should apply the elements-based approach to decide whether a guideline is sufficiently analogous to the defendant's crime of conviction. This inquiry, however, should be "conducted in a flexible and open-ended fashion." *Jackson*, 862 F.3d at 375. "While the inquiry may still be 'bounded by the elements of the offense of conviction,' ... a perfect match of elements is not necessary (or even expected)." Id. at 376. "Instead, the proffered guideline need only be within the same proverbial 'ballpark' as the offense of conviction." Id. Because the elements-based approach is a purely legal approach, and the district court need not consider the underlying facts, see *United States v. Nichols*, 169 F.3d 1255, 1270 (10th Cir. 1999), we will review a district court's determination as to whether there is a "sufficiently analogous" guideline to the defendant's crime de novo. See *Osborne,* 164 F.3d at 437–38.3; *United States v. Betts*, 99 F.4th 1048, 1056–57 (7th Cir. 2024).

The PSR citation to the Fourth Circuit's decision in *United States v. Deffenbaugh*, 709 F.3d 266 (4th Cir. 2013) does not require a different result. In that decision, the Fourth Circuit merely

held that the district court did not abuse its discretion by considering a guideline that it found was not sufficiently analogous to the offense of conviction in its analysis under 18 U.S.C. 3553(a). However, to be clear, by no means did the Fourth Circuit hold that a guideline which is not sufficiently analogous may be used to determine the guideline offense level or that the elements-based approach does not apply in determining whether a guideline is sufficiently analogous.

Applying the elements-based approach here, USSG 2M3.3 is far different from the elements of 18 U.S.C. 1924(a) for unauthorized removal and retention of classified documents. Both the actus reus and mens rea are starkly different between the offenses covered under 2M3.3 versus 1924(a):

As the title and commentary of 2M3.3 make explicit, the guideline applies to convictions of 18 U.S.C. 793(d) and (e) for the willful transmission or communication of classified information to persons not entitled to receive it. But 1924(a) has no such element requiring the defendant to transmit or communicate the information to anyone at all. The statute is violated merely by the actus resus of retaining said classified documents and materials at an unauthorized location—conduct which is less likely to result in any injury to the United States.

Also, the offenses covered under 2M3.3 - 18 U.S.C. 793(d) and (e) - have a heightened mens rea that does not exist in 1924(a). Specifically, 793(d) and (e) have two mens rea requirements that don't exist in 1924(a).

First, for tangible documents, 793(d) and (e) require the government to prove that the classified information was communicated to another with "reason to believe that it could be used to the injury of the United States or the advantage of a foreign nation." For intangible documents, the government is required to additionally prove that the defendant knew that the information "might potentially harm the United States." See *United States v. Rosen*, 445 F. Supp.2d 602, 625-26 (E.D.V.A. 2006).

Second, 793(e) and (e) require the government to prove that the defendant communicated the classified information to another with a "bad purpose either to disobey or disregard the law"—meaning that the defendant knew that the person to whom the information was transmitted was not entitled to receive the information. See *Rosen*, 445 F. Supp. at 426.

These stark differences in actus reus and mens rea means that 1924(a) contemplates far less culpable conduct than the offenses covered under 2M3.3 (in relevant part, 793(d) and (e)). Not surprisingly the more culpable conduct under 2M3.3 incurs far more severe punishment than under 1924(a).

Mr. Unkenholz would be profoundly prejudiced by the application of this inapposite guideline. 2M3.3 contemplates different criminal actions and different criminal intent than 1924(a). And the offenses covered by 2M3.3 trigger a maximum statutory sentence twice that of 1924(a). There is no evidence that Mr. Unkenholz intended to harm the United States, nor that the United States was harmed. 2M3.3 is not an analogous guideline.

## II.     Mr. Unkenholz's Personal History and Characteristics (18 USC 3553(a)(1)

Mr. Unkenholz's history and characteristics are extraordinary. Mr. Unkenholz has led a life of challenges, overcome courage and great service. Mr. Unkenholz is a patriot who devoted his professional life for almost 40 years to protecting his country. It is a life of great achievement. Nevertheless, Mr. Unkenholz has had to navigate great personal challenges.





Despite the social struggles, Mr. Unkenholz has led a remarkable life. He excelled academically. He received his undergraduate degree from George Washington University in 1983. He obtained a master's degree in engineering from Johns Hopkins University in 1988 and a master's in international relations from Salve Regina in Newport, Rhode Island in 2006.

Mr. Unkenholz has had an extraordinary professional career. He joined the National Security Administration (NSA) in 1983 and worked for 39 years until his arrest in this case. Mr. Unkenholz excelled upon joining NSA and became the first GSA 15 in his entering class. He quickly rose through the ranks, to join the Senior Executive Service.

Perhaps, the most compelling description of Mr. Unkenholz is from a group of national security leaders who write in support of Mr. Unkenholz. This letter is signed by two former deputy directors of NSA – Richard Ledgett, Jr. and Chris Inglis. It is also signed by multiple former chiefs of Mr. Unkenholz's office and a former general counsel for NSA.

- **Former NSA leaders:** It's what we know about Mark that impels this letter.

    First, many of us worked closely with Mark at the National Security Agency. We saw his commitment to the country and the Agency, and we were impressed by his creative and impactful contributions over a long career. The Mark Unkenholz we know devoted his life to protecting the United States and he would never have disclosed information that, in the wors of the indictment, "could be used to the injury of the United States." So, without having all the facts, we can only express our deep skepticism that he would do something that justifies prosecution under the Espionage Act.

**Appendix B**
.

Part of what makes these comments so extraordinary is that they were made after Mr. Unkenholz was arrested and charged with violating the Espionage Act. Under the circumstances, the continued support of Mark Unkenholz from former leaders at NSA is a remarkable tribute to Mr. Unkenholz, and the individuals submitting the letter.

Mr. Unkenholz's career at NSA was one of great achievement and complete devotion to the mission. Mr. Unkenholz's former colleague, Melissa Mann, told us that Mr. Unkenholz's job was "his life, and his heart was absolutely a place of mission." We submitted many letters of support from former colleagues of Mr. Unkenholz. They uniformly describe Mr. Unkenholz as a man of extraordinary talent, who was committed to the mission of protecting the United States. Many also

describe him as a warm, patient mentor who made time to support others as they began their journey at NSA. Again, most of these letters are from members of the NSA community who continue to support Mr. Unkenholz even after his guilty plea in this case.[2]

Here are some of the comments:

- **Colby V. Currier, co-worker**:   During the 1990's, I was Chief of Z03 (the predecessor of the CEC) and got to know Mark Unkenholz very well as a brilliant, creative and security conscious subordinate. When I retired at the end of 1997, I returned to NSA as a part-time contractor, working in the CEC as well as the Security and Counterintelligence organization.

  While in the CEC as a contractor, for much of this time I worked for Mark, who served as the Technical Director of the CEC. As was true of my relationship with Mark during the 1990's, he continued to demonstrate his very strong professional and personal qualities and was a true pleasure to work for. By this time, in recognition of his accomplishments, he had been promoted to the senior technical ranks of NSA and was widely respected throughout the technical community of NSA.

**Appendix C**

- **Rick Hutchinson, co-worker**: Over the next five years I came to know Mark as a capable and dedicated public servant, a cornerstone of the CEC's mission, and a wealth of knowledge and insight in a necessarily complex and nuanced working environment.

  He always had time to mentor employees, with a willingness to address all questions and concerns ranging from the mundane day-to-day, to mission-specific problems, to broader career-focused questions about navigating the vast institution that is not just NSA, but the intelligence community as a whole. Mark's thoughtful guidance was instrumental in helping me to grow as a representative of NSA to the broader intelligence community and the commercial world.

**Appendix D**

- **Anna M. Johnston, spouse**: We have been partners for over 35 years, having met at NSA early in our careers. Together, we have more than 70 combined years of experience as cryptographic researchers.

---

[2]   Some of Mr. Unkenholz's family and friends respect and care so much about Mr. Unkenholz that they question the decision to prosecute Mr. Unkenholz.  This is how they sincerely feel.  Mr. Unkenholz is grateful for their support.  But he has accepted responsibility and pled guilty.  In his remarks to the Court at the sentencing, Mr. Unkenholz will express his gratitude to the prosecution for their professionalism during a difficult process.

Besides being the kindest, most empathetic person I know, Mark is also a firm believer in following the rules.

**Appendix E**

- **Samuel M. Johnston, son**: I am writing today to speak to the character of my father, Mark Unkenholz, and the charges he has plead guilty to. Before this unfortunate affair, I have known him to have two motivating drives, his family and his work. On the one hand, growing up, he has always been a caring father who, almost to a fault, strove to fix any problems me or the rest of the family faced as if they were his own. On the other hand, while I was less privy to the work side of his life, it was clear that his job at the National Security Agency was very important to him. I was always fascinated by the sense of purpose and duty he seemed to derive from his work there, which in turn imparted upon me a strong desire to understand this world that mattered so much to my father

**Appendix F**

- **Hon. F. Scott Kieff, friend**:  Throughout the time that I have known Mark, across all of my many interactions with him, he has consistently conducted himself with the utmost professionalism and steadfast loyalty to NSA and our Nation, to his assigned mission and teammates, demonstrating the strongest character. Even when in the face of immense stress, with the highest of stakes on the line, I consistently saw Mark work hard to stay within the boundaries of established law. I regularly observed him applying high level professional excellence, including purposeful adherence to law, authority, and morality. I have always seen Mark act with deliberative, thoughtful, and careful professionalism, showing respect for both the rules and the people around him. Furthermore, all feedback I ever received about Mark from colleagues in and around the communities at Hoover and NSA was entirely consistent with this view of Mark.

    It is important to recognize the seriousness of these proceedings and their present posture, including that Mark has entered a plea. To get that far is, itself, a severe price to be paid for a public servant like Mark, who spent a life of service in our intelligence community. To get that far is also a powerful reflection of deep respect and appreciation for the vital roles served by the Court and the executive branch prosecutors in protecting the Nation and enforcing our laws.

**Appendix G**

- **Charlotte Knepper, Chief of Mr. Unkenholz's office:** Since approximately 2005, Mark was the Senior Technical Director of the CEC (and its predecessor offices), and I was the Chief of the office in the last 3 years before my retirement. I relied heavily on Mark for his technical expertise, creativity, historical knowledge, and balanced decision making. (Indeed, the senior-most ranks at NSA expressly

sought out Mark's judgement and technical decision making.) The mission business of our office was complex and very challenging to navigate important policy, legal, financial and security requirements when engaging with the private sector. This was further complicated since NSA's mission work ranges from unclassified to extremely classified. It required enormous patience and attention to detail, and Mark was very sensitive to these requirements and ensuring that project work done by him or other personnel proceeded in the responsible fashion. At no time in all our years of working together, did I doubt Mark's judgement nor his duty to our nation.

And more importantly, there were numerous instances where split-second decisions needed to be made by Mark on particular projects, especially when lives were at stake, further underscoring the gravity and daily pressure of our work and the enormous positive impact that Mark had over the years.

## Appendix H

- **Sara S. Mahood, co-worker**: Over the many years I worked in this organization the senior managers changed regularly, but Mark as the technical director was a constant. He was also trusted counsel for new leadership knowing the organizational history and issues. The organization has always had its challenges operating on the front line with advances in security technology outpacing government solutions. Often the issue and solution were not crystal clear but fell more in the grey areas which made it all the more challenging to navigate and required Mark's talent and creativity. Mark's ability to stay within the lines, achieve success and accomplish the mission was well recognized, respected and sought after by government leadership.

  He was a good listener with excellent communication skills providing great insight. His dedication and commitment to advance the mission was relentless. Mark was very dependable and had a strong work ethic because he loved the work. Working long hours focused on the mission he rarely took vacation, donating his leave to the agency's leave bank to help others. His knowledge and expertise in math, security, and cryptography were highly respected by leaders in government, industry and academia alike. He was thoughtful, pragmatic, and cautious to help develop solutions that addressed a wide range of issues, helping protect our nation.

## Appendix I

- **John J. Stasak, III, co-worker**: I have known Mr. Mark Unkenholz for over 25 years. I worked closely with him during many of those years. Mr. Unkenholz is best described as a patriotic American who worked hard to keep America safe. He was a technical leader serving in the National Security Agency's senior technical rank for over 20 years.

**Appendix J**

- **Katrina Vazquez, co-worker**: During the years we worked together, I came to know him as a thoughtful and diligent individual who consistently demonstrated unwavering dedication to the mission of the National Security Agency.

  Mark routinely arrived early and stayed late, showing his dedication to his work and to the team. What stood out most, however, was the time and energy he devoted to mentoring others. He was an exceptional mentor not only to me, but to many junior employees.

**Appendix K**

- **Michael Young, co-worker**: His dedication to the mission was second to none. While most people would spend their weekends enjoying time away from the office, he would frequently show up on Monday mornings with ideas for fresh approaches to difficult problems. He clearly spent many of his non-working hours researching and thinking through work related topics, demonstrating a clear and unwavering focus to the mission. Unfortunately, the nature of the work does not allow for detailed examples of this, although they are countless in number.

**Appendix L**

- **John C. Nagengast, co-worker**: While I served as the Principal Director for Corporate Strategy, I was deeply exposed to Mark's work in engagement with commercial companies to stay abreast of emerging innovations and trends in technology and preparing for their impact on the NSA mission areas. I found Mark to be very thoughtful and highly dedicated to his job and fulfilling his challenging role in supporting the NSA missions.

  Engagement with the commercial technology innovators often involved sensitive discussions with companies that have no security clearances or cleared personnel of any kind. They were frequently concerned that even the most innocent discussions about their technology and products with NSA could damage their reputation in the marketplace and impact their business prospects, particularly with foreign customers. On many occasions, I personally saw Mark skillfully navigate through the maze of challenges required to establish meaningful discussions with the most innovative companies, without revealing any classified national security information or exposing the company in a negative way. I certainly held Mark and his dedication in the highest regard, as did all the other senior leaders at NSA. He did a difficult and complex job extremely well.

**Appendix M**

- **Stanley Potter, co-worker**: Mark shared his passion for commercial cryptography with many other NSA cryptographers, engaging us with his findings in commercial cryptographic research, and keeping us up-to-date on the state-of-the art developments in this very specialized field.  He genuinely cared about maintaining a healthy collective knowledge of commercial cryptography at the NSA
.

  Mark spent his career developing a knowledge base of commercial cryptography, ensuring that the knowledge base endures, developing future cryptographers, and advising senior leaders at NSA.  It is my hope that Your Honor will take into consideration his dedication to his family, to his colleagues at NSA, and to his country in the sentencing phase.

**Appendix N**

Mr. Unkenholz is now 64 years old.  He has led a remarkable life.

### III      The Nature and Circumstances of the Offense.

Mr. Unkenholz has accepted responsibility for sending to a former colleague several emails that contained classified information. The context in which those emails were sent makes this case far less aggravated than the typical case and is a reason both parties recommend a no jail sentence.

First, Mr. Unkenholz had no intent to harm the United States and did no harm. Mr. Unkenholz was communicating with a former colleague about ways she could assist NSA and advance the mission. Mr. Unkenholz worked in a special unit that was responsible for engaging with private industry. His former colleague was working in private industry, and Mr. Unkenholz saw an opportunity for them to work together. Mr. Unkenholz, and his former colleague were in an email exchange to collaborate and support the mission of protecting the United States.

Second, the line between classified and unclassified can be uncertain. This uncertainty is increased exponentially in this context because Mr. Unkenholz's unit was tasked with communicating and partnering with the outside business community. This type of communication was routine between Mr. Unkenholz's office and the business community and it frequently involved sensitive matters.

Mr. Unkenholz's former colleague, Melissa Mann, explained that the process for deciding what information to share is "squishy." The discovery in this case has revealed that at some point, an NSA relationship with any party may be classified and, at other times, it may not be classified.

The former NSA leaders in their letter address the uncertainty surrounding the line "between properly and improperly disclosing classified information".

**FORMER NSA LEADERS:**

> "We know that the line between properly and improperly disclosing sensitive information is not always clearcut. Most of us are familiar with situations in which the national interest requires the sharing of sensitive information even though the rules for that sharing are less than clear. In those circumstances, the line between proper and improper disclosure must be drawn by good judgment and discretion. Once again, not having all the facts, we can only ask that you review them with this principle in mind. We understand that there can be differences in judgment, particularly about Mark's choices in the communications at issue, but given Mark's career, we would have expected disagreements about his judgment to be resolved in a disciplinary proceeding, not a criminal prosecution."

Dr. Black, in his report, describes how Mr. Unkenholz would feel compelled to over rely upon email. More importantly, he was "cognitively inflexible." Cognitive flexibility allows an individual to shift strategies in solving problems and respond effectively to collective feedback. Mr. Unkenholz struggles to calibrate approaches to problem solving. The gray area of the classification rules of Mr. Unkenholz's office made it difficult for him to adjust and were a minefield for him.

Finally, Mr. Unkenholz had no intent to harm. He received no illicit financial benefit and has no untoward motive based on ideology or pecuniary gain. He was not loyal to another country, or whistleblowing for some perceived greater cause. He was doing his job.

Mr. Unkenholz has acknowledged violating the law and accepted responsibility. He went about it the wrong way. But the several emails at issue were sent while performing his duties and supporting his office's mission. Mr. Unkenholz was trying to do his job.

## IV. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Punishment, 18 U.S.C. § 3553(a)(2)(A).

The Court is required to consider the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). These goals have already been served through the prosecution of this case and the guilty plea.

The collateral consequences that Mr. Unkenholz has experienced and will continue to experience as a result of this case are profound. Mr. Unkenholz lost a job that was his calling. He will lose employment opportunities and numerous civil rights that are important to Mr. Unkenholz. These consequences have long been recognized as a basis to forgo prison as punishment. See United States v. Nesbeth, 188 F. Supp. 3d 179, 180-81, 184 (E.D.N.Y. 2016) (explaining that "there are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons," and referring to them as "civil death"). Such collateral consequences are appropriate to consider under the "just punishment" prong. See, e.g., United States v. Pauley, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming sentencing court's consideration of the loss of the defendant's teaching certificate and state pension in granting downward variance as "consistent with § 3553(a)'s directive that the sentence reflects the need for 'just punishment' and 'adequate deterrence'"); United States v. Thavaraja, 740 F.3d 253, 262-63 (2d Cir. 2014) (collateral consequence of deportation is a permissible § 3553(a) factor); United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009) (affirming lower court's consideration of conviction's effect on the defendant's future employment opportunities, because "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); United States v. Jaime, 188 F. Supp. 3d 262, 265 (D.D.C. 2017) ("[T]he Court is mindful of the potentially devastating collateral consequences of a criminal conviction, including it being an impediment to future employment."); Nesbeth, 188 F. Supp. 3d at 187.

Mr. Unkenholz lost his position at NSA after 39 years. This job was his identity. It was part of his family's identity. Generations of his family worked at NSA. Both his parents and his brother worked at NSA. He met his wife while they worked at NSA. His son planned to follow in his parents' footsteps and work at NSA. It is impossible to overestimate the pain that this prosecution has caused Mr. Unkenholz and his family.

Charlotte Knepper, former Chief of Mr. Unkenholz's office, succinctly captures the harm that Mr. Unkenholz suffered, "having worked so closely with Mark on a daily basis for so long, and witnessing first-hand the sacrifices he made in routinely working late hours, giving up time with his family and dedicating his life to the missions of NSA, I know the accusations against him have had a detrimental impact on Mark. He comes from a family of two generations that cherished public service and took pride in contributing to NSA's missions, and sadly this prosecution has permanently stained his reputation and his life's work. Given his years of professional and emotional investment in NSA, this is very hard to recover from."

Mr. Unkenholz currently volunteers at the Red Cross in the State of Washington. His service at the Red Cross has allowed him to start to recover from the crushing blow of his arrest and separation from NSA. It says something important about Mr. Unkenholz that the relief he needed from the stress of this case, and the loss of his employment and community at NSA, was to find another way to serve. Mr. Unkenholz works as part of the local disaster response team. He also teaches as part of the training program with the Red Cross. While his supervisors know of the pending charges, Mr. Unkenholz entered the plea in this case knowing that his Red Cross employment was at risk because of the conviction.

"Just" punishment in this case does not require a sentence of incarceration. Mr. Unkenholz has already been punished. The defense proposes a non-incarceration sentence to include a one-year term of supervised release. As the PSR outlines in detail, the mandatory and standard conditions of

supervision are tangible requirements and restrictions placed on Mr. Unkenholz.   On supervision,

Mr. Unkenholz will be subject to such conditions as:

- Reporting to a probation officer;

- Not leaving his home state without prior authorization from the Court or the probation officer;

- Answering questions of the probation officer;

- Living in a place approved by the probation officer;

- Obtaining approval for living arrangements;

- Not changing living arrangements without probation officer's approval;

- Allowing the probation officer to visit at any time at any place, including the home;

- Working full time (at least 30 hours per week) unless excused by the probation officer;

- Notifying the probation officer of a change in where she works and any change in position or job responsibilities;

- Not knowingly communicating or interacting with anyone she knows has been convicted of a felony without first getting the probation officer's permission;

- Notifying the probation officer of any questioning by law enforcement;

- If the probation officer determines that Ms. Mosby poses a risk to another person, including an organization, the probation officer may require her to notify that person/organization about the risk. Probation may contact the person/organization and confirm the risk notification.

- Following all instructions of the probation officer related to the conditions of supervision.

Those conditions outlined in the PSR are punishment.  Failure to comply puts Mr. Unkenholz

at risk of going to prison for three years.

## V.   The Need for the Sentence to Afford Deterrence (18 U.S.C. § 3553(a)(2)(B).

A prison sentence is not necessary to achieve specific or general deterrence.

### A.   **There is No Need to Send Mr. Unkenholz to Prison to Specifically Deter Him**

For Mr. Unkenholz, the charges in this case come after a lifetime of good character and many decades of service to his country. This offense was aberrational for Mr. Unkenholz in every sense of the word. He will never make a mistake in judgement like this again.  Mr. Unkenholz's good character will deter him.

In addition, this charge was unique to Mr. Unkenholz's employment setting. Mr. Unkenholz will never commit another crime because of the person he is. He will never again be in a position to commit a crime like this again.  He will never have a security clearance or be employed in a position like this again. He will not have access to material like this again.  Mr. Unkenholz is no risk to recidivate.

### B.   **Empirical Data Shows That General Deterrence Flows From Certainty Of  Prosecution, Not Whether Incarceration Is Imposed Or More Incarceration Rather Than Less**

As to general deterrence, the fact alone that Mr. Unkenholz has been prosecuted provides deterrence to others who are similarly situated. There is no evidence that additional jail time provides a meaningful deterrent effect. This is a well-known, empirically based fact: "Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment." See Valerie Wright, The Sentencing Project, "Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment" 4 (Nov. 2010).26 Likewise, Daniel Nagin, a leading deterrence scholar, concludes that "[t]he evidence in support of the deterrent effect of the certainty of

punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension." Daniel S. Nagin, "Deterrence in the Twenty-First Century: A Review of the Evidence," Crime & Justice, Vol. 42, No. 2013.

This finding is echoed elsewhere, too. See National Research Council, National Academies Press, "The Growth of Incarceration in the United States: Exploring Causes and Consequences" 90 (2014) ("Three National Research Council studies have examined the literature on deterrence and concluded that insufficient evidence exists to justify predicating policy choices on the general assumption that harsher punishments yield measurable deterrent effects. Nearly every leading survey of the deterrence literature in the past three decades has reached the same conclusion." (citations omitted));[3] Ray Paternoster, "How Much Do We Really Know About Criminal Deterrence?", 100 J. Crim. L. & Criminology 765, 801 (2010) ("Certainty of punishment is generally considered to be more important than the severity of that punishment."). The Department of Justice's National Institute of Justice has issued its own guidance reflecting that "[i]ncreasing the severity of punishment does little to deter crime" and "[t]he certainty of being caught is vastly more powerful deterrent than the punishment." See U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, "Five Things About Deterrence" 1-2 (May 2016) (emphasis added).[4]

The goals of general deterrence will be met without a prison sentence.

---

[3] https://www.nap.edu/read/18613/chapter/1.

[4] https://www.ncjrs.gov/pdffiles1/nij/247350.pdf

### C. The Cataclysmic Consequences from Prosecution and Conviction that Mr. Unkenholz Has Already Suffered Sends a Strong Deterrence Message.

The profound impact of this prosecution on Mr. Unkenholz has already sent a message of deterrence. In fact, numerous letters of support from longtime NSA staff, including many leaders, express concern that the deterrence message may inhibit work necessary to the mission.

**FORMER NSA LEADERS**

> Finally, we ask that you weigh the impact of this prosecution not only on Mark but on the workforce at the NSA. These charges have already upended Mark's life, which was devoted to the Agency for decades. The many NSA employees who worked alongside Mark understand the profound bleakness he faces – the prospect of losing not only the career that gave meaning to his life but also the pension he no doubt expected would sustain him and his wife when his work came to an end, along with the prospect of spending the rest of his life in prison.

> What they, and we, do not understand is why such a harsh penalty would be imposed. We have read the indictment, and we don't see any hint that Mark is suspected of espionage or corruption. This raises the very real possibility that he is being prosecuted over a disagreement about how or when to disclose sensitive information in service to the country. If so, many of NSA's most productive and committed employees may ask whether they too are at risk of similar treatment.

**Appendix B**

Former NSA general counsel, Stewart A. Baker, in his letter, also expresses concern about the message this prosecution has sent.

> Finally, please indulge me in a point not directly related to sentencing. I have been struck by how many NSA employees, including senior executives, have questioned why this case was pursued criminally. Some of them have done the same kind of work as Mark did and others have depended on his successes. NSA employees are not known for challenging the decision of leadership. But in this case, many of them have spoken out, fearing that the case will depress the workforce's morale and willingness to take risks.

> I share that fear. I think anyone who reads the leaders about Mark's sentencing would at least have concerns along those lines.

Appendix O

A prison sentence is unnecessary to send a deterrence message to others.

**VI    The Need to Protect the Public and Provide Training or Other Correctional  Treatment (18 USC § 3553(a)(2)(C)-(D)).**

The Court must also consider the need to protect the public and provide training or other correctional treatment. There is no need for further punishment of Mark Unkenholz to protect the public. Quite the opposite, we need Mark Unkenholz in his community looking for ways to serve his neighbors, his fellow Americans.

## CONCLUSION

The parties jointly recommend a no jail sentence for Mark Unkenholz.  Any sentence of incarceration would be "greater than necessary" to serve the purposes of 18 U.S.C. § 3553(a) because of (1) Mr. Unkenholz's extraordinary character; (2) the unusual nature of the offense, i.e., Mr. Unkenholz intended no harm and did no harm; and (3) the extraordinary consequences that Mr. Unkenholz already suffered due to this prosecution.

18 U.S.C. § 1924(a) is a Class D felony and requires not less than one year's probation.  The defense requests a sentence of one-year probation.

A jail sentence is not justice for Mark Unkenholz.

Respectfully submitted,

JAMES WYDA
Federal Public Defender

_____/s/_____
James Wyda  (#25298)
Office of the Federal Public Defender
100 South Charles Street
Tower II – 9th Floor
Baltimore, Maryland  21201
Telephone:  (410) 962-3962
Facsimile:  (410) 962-3976
Email:  jim_wyda@f.org