# APPENDIX D

Mr. Brian M Peters



15 July 2025

The Honorable Stephanie A. Gallagher

United States District Judge

c/o Office of the Federal Public Defender

100 South Charles Street,

Tower II, 9th Floor

Baltimore, Maryland 21201

Dear Judge Gallagher,

My name is Brian M Peters, and I appreciate this opportunity to provide a character reference for Mr. Mark Unkenholz, my friend and former colleague who has pled guilty to the unauthorized removal and retention of several classified materials, in violation of 18 U.S.C § 1924.

I knew and worked with Mark for over fifteen years prior to my retirement in 2016 as a Senior Executive. My wife, who retired in 2017 from the Agency as an Executive, also had the pleasure of working directly with Mark for several years during her career. We are both honored to continue our friendship with Mark to this day. He is a loyal friend and mentor; a second-generation Agency employee (both of his parents worked for the Agency and its predecessors); a caring husband whose wife, a gifted mathematician, also worked for the Agency as an employee and contractor; and a devoted father of yet another brilliant mathematician whose desire to work for the Agency ended with Mark's arrest. It is not hyperbole to say Mark considered the Agency to be his home, his coworkers his family, and his work his life's meaning.

As Mark's friend, I am compelled to inform the court of Mark's professionalism, expertise and dedication to security of this great nation.  As a retired NSA Senior, I am also greatly concerned that Mark's unprecedented arrest has caused considerable

1

confusion and doubt amongst Agency personnel, contractors and other community partners. I know that they will be looking closely at the outcome of this case for clarity and confirmation that their actions are both legal and defensible in their efforts to ensure the security of our nation.

I retired from the National Security Agency with over 35 years of technical and managerial experience working in the Operations, Field, Technology, and Acquisition elements. I was certified as an Intelligence Community Officer and a DoD Program Manager. For a number of years, I operated the Agency's Military Intelligence Program (the military counterpoint to the National Intelligence Program which funds NSA's operation). In the course of my career, I have worked closely with both foreign allies and other government partners to collect, exchange, and disseminate both classified and unclassified data. In short, I have a very nuanced understanding of the classification system, contracting activities, funding rules, Agency processes, procedures, and culture. I also had actual working experience with some of Mark's extensive technical efforts, his office's mission, and its unique role in Agency operations. It is my sincere desire to share some insights into these areas so that the court may better understand Mark's actions as I do.

Let me start by saying I have had the opportunity to read the redacted emails which are the basis for the charges against Mark. I have been out of government service too long to be quickly re-indoctrinated and allowed to read unredacted material, but not so long that I was unable to extrapolate the reasoning of the Agency's Classification Review Officer(s) in determining that some of the emails were classified. I strongly disagree with that determination. Mark would have had no difficulty winning a classification challenge in accordance with NSA policy[1] if this were handled (as it should have been) as an internal matter. Unfortunately, the same policy states that "NSA/CSS will not entertain classification challenges of information ... that is the subject of pending litigation." Having been charged criminally, Mark is now required to "prove a negative" against the government's position in court. Given that the Agency

---

[1] NSA/CSS Policy Manual 1-52, "NSA/CSS Classification", see page 12, "Classification Challenges". https://www.nsa.gov/portals/75/documents/news-features/declassified-documents/nsa-css-policies/NSACSS_PM_1-52_20210108.pdf

will decline to defend its determination in court because of the risk of exposing actual classified information, Mark has no real ability to challenge the Agency's classification determination *about his email contents*[2] as wrong. Mark acknowledges that under specific conditions the information could become classified, but not as presented in his exchanges.

Many people, especially those who do not work in industries that routinely deal with classifications, have difficulty believing that information can be classified and unclassified at the same time. Context matters. Associations matter. Aggregations matter. And more frequently than not, "dirty knowledge"[3] can confound classification assessments.

One of the many routine challenges for Mark and his office arises from representing both of NSA's two primary missions – SIGINT (Signals Intelligence) (seen as an offensive effort) and what is today called Cybersecurity (previously Communications Security) (seen as a defensive effort). While complementary, these two disciplines support two very opposed cultures and mindsets that are reflected in their respective classification activities. "Facts" that are highly classified by one element can be held unclassified by the other.

Using a contracting example to illustrate – if Company ZZ makes a commercial security device and the "fact" that the company works with NSA becomes publicly known, three things will likely be assumed: 1) "NSA" refers to the SIGINT element, 2) the device has been weakened and is insecure and 3) the government is collecting all the data protected by the device. A probable consequence is the company will lose business. However, if it became public knowledge that the NSA *Cybersecurity* element certified or provided assistance developing the security routines for the device, sales to governments and large companies would increase as would company profits.

---

[2] I emphasize the contents of the message because the same information, relayed in an internal Agency email, could very well be very sensitive based on something as innocuous as the email recipients.

[3] "dirty knowledge" is when an individual has more information available to them than is presented for review and introduces that "extra" detail into the determination. A legal parallel might be a Judge ruling some data as inadmissible and instructing the jury to disregard it, but they don't. I had dirty knowledge of the redacted content in Mark's email by virtue of my job in acquisition prior to retiring, and my previous association with the CRO who made the initial Agency determination. The term is not pejorative, it simply reflects a mostly unconscious addition of facts not presented.

3

So, an actual SIGINT relationship would likely be classified to prevent public disclosure (protecting sources) and knowledge within the company would be limited to a few key personnel (to prevent disclosure). A Cybersecurity relationship would likely be unclassified, openly acknowledged and known throughout the company. If the Agency implemented *both* relationships the SIGINT element would *ideally* develop a classification guide indicating "the fact of a SIGINT relationship with Company ZZ is classified XX" and the analog guide in the Cybersecurity element would indicate "the fact of a relationship with Company ZZ is unclassified". In practice however, the SIGINT guide would not specify a "SIGINT" relationship as that would be implied by the element using the guide; and by definition there would be no Cybersecurity guide because the relationship was unclassified.

It is not difficult to imagine a circumstance where a Cybersecurity analyst produces a report mentioning work being done by his organization with Company ZZ which is then read by a SIGINT analyst who is fully aware of the classified relationship. Typically, the Cyber analyst would not be aware of, or cleared for, the SIGINT relationship with the company.[4] The SIGINT analyst, believing the information to be classified, would raise his concerns through his chain and an informal classification challenge process would occur. The reasonable decision would be an update of the SIGINT classification guide to reflect the "fact of" an unclassified Cybersecurity relationship and not the arrest of the Cyber analyst. If other concerns are raised along the way, a formal challenge would be brought to the appropriate Original Classification Authority (OCA) for determination - as of 2021 the Agency had 16 OCAs which speaks to the diversity of classifications and the potential for conflicting guidance.

When companies are first approached about doing work with NSA, the Agency is generally sensitive to potential impacts to the business. Despite public misconceptions, the Agency does not resort to coercion to compel relationships with private companies. Unlike law enforcement, where compelling a company to accommodate the government is usually a "one and done" event, the relationships the

---

[4] This and similar conflicts occur as a result of "compartmentation" of activities, where "those with a need know" and "everybody else" might have overlapping efforts. The very nature of the protection system creates these incidents, and requires a deconfliction process.

Agency establishes are for the long term and must be mutually beneficial. Starting, growing, and maintaining these relationships is exceptionally difficult and requires a great deal of trust and dialogue on both sides.

The office where Mark served as the Senior Technical Director was created in part to address the need for working with companies having potentially unique or vital capabilities (or were exceptionally at risk by having a relationship with the government). It also served to limit the interactions between the company and Agency to one organization representing both mission elements. It was the responsibility of Mark's office to engage with the company; assess business opportunities and capacities; build trust and rapport; and if the relationship was considered to be of value, get a contract or contracts in placed to do business. Mark was exceptionally good in these outreach efforts and he mentored a significant number of employees who perform these duties today.

A couple of points that may not be immediately obvious – with extremely rare exceptions discussions with a new company prior to contract award are unclassified. A contract must be in place to sponsor (clear) company employees so classified discussions usually occur after a contract is in place. Most companies do not even have the infrastructure to support classified exchanges until they have enough business to justify the considerable expense.

For this reason, Mark and his office were expected to have discussions on very sensitive topics at the unclassified level. As Senior Technical Director for his office, Mark was considered a "subject matter expert (SME)" relating to the classification of the content and scope of discussions with companies handled by the office. Given the large number of classification guides in use, Agency classification review officials refer to SMEs when specific classification questions arise. Personally, I was required to have detailed discussions with Mark regarding specific contractor relationships managed by his office and I found him to provide very consistent and knowledgeable classification guidance.

Another point is the use of "personal email" to conduct these discussions. Employees of the Agency may be issued Top Secret, Secret, and Unclassified email accounts clearly attributable as Agency accounts, to conduct their official business. At

5

the unclassified level there are also email accounts that are not obviously attributable to the Agency, yet remain attributable to the government. One common "characteristic" of these accounts is that employees *must be physically at work* to access their mail (read and send). Network security requirements do not allow employees to connect to official unclassified mail servers from outside of secure work spaces. If it is necessary to email a company outside of government spaces a "personal email" account is required[5]. This practice exists across Agency elements needing to have 24/7 contact with "the outside world." People working in acquisition, information technology and logistics are frequent examples. It is simply not possible to physically be "at work" all the time. Serendipitously, these personal accounts also provide a measure of non-attribution that is beneficial in conducting new commercial engagements as direct government attribution is avoided. Encryption of the email contents, though not mandated for all exchanges is helpful in reducing the risk of inadvertent exposure.

I have heard suggestions and possibilities about how Mark came to be charged and arrested, but I do not know anything for certain. I do know that previous arrests and convictions of Agency personnel were for intentional criminal misconduct – personal gain, desire to harm the country, desire to advance another country, political agendas, grievances against the Agency. I have never heard of a single case of an employee performing their official functions, following standard practices, and exercising due diligence being arrested and charged as Mark has in this case. Perhaps the government began this exercise with more serious crimes in mind, but classification discussions aside, it is clear from Mark's emails that his conversations were strictly to engage a company to work with the Agency to satisfy national security needs. If Mark, representing competing interests across the Agency, was indeed wrong in his professional assessment that the information was classified, it was not a criminal act – it was an administrative error for which internal, non-punitive, processes are in place. His use of a personal email address to conduct these conversations is not uncommon

---

[5] There are very specific and rare exceptions (key personnel) to this fact requiring the use of government provided devices; however, it is generally considered to be cost prohibitive for routine unclassified level activities.

*nor prohibited* and was limited to necessary circumstances as determined by the business engagement being explored.

At this point I would like to apologize. I have found it difficult to compose this letter without becoming angry and disappointed with the Agency's handling of Mark's case. I hope that has not clouded the insights I wanted to share with you. I realize a number of seasoned individuals in the Office of General Counsel, Security, and elsewhere had recently retired or moved on before Mark's arrest. Had they been in place, perhaps they would have honored the Agency's promise of defending its employees when they follow the rules and found a different way to handle Mark's case.

It saddens me to know that Mark followed the rules and now the reputation he worked decades to earn is destroyed, the job he loved lost, and his sense of his place in the world shattered. He has lost friends and had others put him at a distance out of fear for their jobs. His friends and associates in the community, as well as contractors and foreign partners have all questioned how they will do business with the Agency in the future. To many key companies and individuals Mark was the face of the Agency and they are now questioning if their trust was misplaced. Still, the people I worry about the most are the Agency employees left behind to continue the work Mark did. The very ones who are now following the rules as Mark did, and worrying if they are doing something wrong.

I appreciate character references are usually short and sweet detailing how unusual and uncharacteristic it is for the subject individual to have done wrong. They are certainly not overly long characterizations of an agency, classification ambiguities, and contracting concerns like this has been, but I believe it is important for the Court to understand some of the nuances of Mark's world to better evaluate his actions and most importantly his intent. I know this has hit Mark hard and he is unable to understand how things have come to this point. His friends and supporters feel the same way.

Mark's acceptance of the final charges against him is sincere. He has always accepted responsibility for his actions believing them to be correct and that has not changed. In our conversations his desire to end this nightmare for himself and family is clear; but more tellingly, he always expresses his concern for "the office", "the mission",

and the people he has worked with, trained, and supported over the years. He wants closure and clarification for them so that they can continue to serve with pride and distinction. Not in fear. He also regrets that his son will not experience the honor and privilege of serving his country in the way his grandparents and parents have.

I appreciate your time, and consideration, and hope that you will find a way to achieve a morally just outcome for Mark's case. He has served his Nation selflessly and with distinction his entire life and deserves a measure of restorative justice.


Most Sincerely,

Brian M. Peters

8

Mark Wilson



November 13, 2025

The Honorable Stephanie A. Gallagher
United States District Judge
c/o Office of the Federal Public Defender 100 South Charles Street,
Tower II, 9th Floor
Baltimore, Maryland 21201


Dear Judge Gallagher:

This letter is written in support of Mark Unkenholz. I have had the pleasure of knowing and
working with Mark and his wife Amy ( Anna ) for 35 years. I worked for and with Mark at NSA
from 1991 until the end of 1995 and we stayed friends until this day.

My professional career began at NSA as a crypto mathematician in 1988. I was hired as part of a
technical development program allowing newly hired mathematicians approximately 3 years to
work in a variety of offices for 6-9 month tours providing experience in areas specific to solving
NSA problems. As one of my tours I selected a small office in 1991 where Mark was on
temporary detail as a manager. It was immediately clear that Mark was brilliant, respected by
everyone in the office. I also quickly learned he had a great rapport and a knack for instilling
confidence with those us younger with limited experience. Over time I would also understand
Mark was very respected by the most senior NSA technical experts. While Mark was not that
much older than some of us, he proved himself to be a selfless mentor, not just as support for the
work we were performing under his guidance but also helping us figure out our future at NSA.

In 1992 Mark approached me to work on a new project. I was interviewed by the program
manager and accepted. At the time this project was very sensitive and important. For me to learn
who was "read in" on the effort I remember the program manager showing me a single piece of
notebook paper with a handwritten list of people approved for access to the information which
probably had less than 30 names. Mark was the technical expert for this project, and we worked
closely together for the following three and a half years, until I resigned from NSA. The friends I
made and confidence I gained from Mark's guidance during this period has continued to help me
as sixty-one-year-old. I have been fortunate to have had a lot of success in commercial industry,
building and selling one company, owning a second company which contracts technical experts
to NSA. I am also the co-owner of an automation company, employing approximately 140
personnel in 5 states. None of this would have happened without the confidence I gained

working with Mark, especially knowing someone with his skills allowing me the freedom to take on responsibility.

I have stayed friends with and in contact with Mark since my early days at NSA. It was good to see him climb the technical ranks at NSA, knowing he deserved the recognition. In the few years prior to COVID my company was selected to work with Mark's organization, where again I had the chance to work with him and his team of technical experts. Mark was the same old Mark, guiding and teaching the younger staff while we were supporting them. These efforts were sensitive in nature and if disclosed could have put my company at risk. I trusted Mark in 2016 and I would trust him today in the same situation. Mark has always taken his work, commitments and relationships seriously.

Mark's technical credentials speak for themselves. What would not be known is how many individuals are loyal to him due to his truly caring for their wellbeing and personal growth. Unfortunately, I have a 27-year-old daughter who has struggled with various autoimmune neurological diseases since she was 13. There is never a time when I have talked with Mark that he does not begin the conversation with "how is Sophia doing." He makes it a sincere obligation to understand the important things in his friends lives and it is appreciated.

Mark has been a caring and devoted husband and father. His wife Amy is a brilliant mathematician earning a PhD from Royal Holloway, University of London. His youngest son Sam likewise is a talented mathematician and has been in graduate school in England. Their oldest son Ben is autistic and has training and interests in video production. Having a child with needs is not easy but Amy and Mark have been diligent, loving parents.

Like most married couples Mark and Amy had their challenges. Years ago Mark suffered from depression, and he and Amy divorced. Amy moved to Albuquerque. Mark and Amy maintained a solid relationship and Mark spent every spare day visiting Amy and the boys. Mark worked on his depression with meditation. Continued his hobby of painting military figurines and he and Amy remarried. Mark focusing on himself and not self-medicating with drugs or alcohol speaks volumes to his character. During a period prior to their remarrying Amy moved back to Baltimore and they eventually re-married.

Mark's indictment was horrible for Mark, his family and friends. It isolated Mark from many of us even though I for one tried to reach out to him. I stayed in touch with him through Amy. He had travel restrictions which made it tough for him to visit Sam in England, and it clearly put him in a position of questioning what people thought of him when his reputation was built over many years of tireless work for NSA as well as his family tradition of working for NSA. Mark has enjoyed volunteering and working for the Red Cross. Another sign of his commitment to community. I am concerned this prosecution could preclude him from continuing this service.

I was one person interviewed by the FBI and US Attorneys during their investigation. I made it very clear I did not agree with the original indictment. I also expressed my concern about damage to US national security with Mark gone from the organization, especially without a solid transition plan. I have had experience with Mark's prior organization on and off since 1991. That office performs a unique function within the intelligence community and hard for someone to understand without knowledge and experience in their work and responsibilities. Mark was

almost unique in his ability to perform the duties he was responsible for, which required a wide range of technical skills and policy. As a taxpayer an employer and an NSA clearance holder since 1988 I would still recommend Mark for his previous position.

Sincerely,

Mark Wilson